## Reade and Jephson *against* The Commercial Insurance Company.

Where a vessel was insured from *New-York* to *Bourdeaux*, and had *French* passengers on board, and the owners instructed the master to go to sea through the *Sound*, in order to avoid the chance of detention by *British* cruisers, then off the *Hook*, and the master went through the *Sound*, instead of going thro' the *Narrows*, to the *Hook*, which is the most *usual* and least dangerous route, it was held not to be a deviation.

A vessel was insured from *New-York* to *Bourdeaux*, and consigned, with a part of the cargo belonging to the owner, to a person at *Bourdeaux*, on whom the owner had drawn bills to the full amount of the goods and freight; and the master applied to the consignee for money to make the necessary repairs, to enable the vessel to return to *New-York*, and the consignee advanced the money, and took a *bottomry bond* for the amount. It was held, that the insurers, under the circumstances of the case, were not bound to pay the bottomry bond, but only for the repairs. A master of a ship may, in a case of necessity, *bona fide*, bottomry the ship, at the port of destination, as well as at any other foreign port.

THIS was an action on a policy of insurance, on the ship *Frances Ann*, on a voyage from *New-York* to *Bourdeaux* and back to *New-York*.

The cause was tried at the *New-York* sittings, the 12th of *December*, 1807, before Mr. Justice *Spencer*.

The vessel sailed from *New-York* through the *Long-Island Sound*. The master testified that he was instructed by his owners to take that course, in order to avoid the chance of detention or delay, by *British* ships of war, two or three of which were then cruising off *Sandy-Hook*. There was no particular or unnecessary delay during the passage through the *Sound*. The vessel sailed the 7th of *September*, 1807, and had on board a number of *French-men*, as passengers, some of whom were sent home on

account of the *French* government, and part of the cargo consisted of colonial produce.

There are two passages to the sea from the port of *New-York*. One of them is through the *Sound*, which separates *Long-Island* from the main land ; the other is through the *Narrows* to *Sandy-Hook*. The latter is the most usual and convenient passage for vessels bound to sea. Homeward-bound vessels often come in through the *Sound*, but that depends on the state of the weather, and the part of the coast first made. Outward bound vessels frequently go to sea through the *Sound*; and there are regular *Sound* pilots. It did not appear that leave was ever asked, or thought necessary to be obtained from the insurers, to go through the *Sound*. Several witnesses testified, that under the circumstances, it was prudent for the *Frances-Ann*, to go through the *Sound*, as one or more *British* frigates were at that time off the *Hook*, and her having *French* passengers and colonial produce on board, would have rendered her more liable to detention.

The ship having suffered considerable damage during her voyage, it became necessary to repair her at *Bourdeaux*.

The ship was consigned by the plaintiffs to *P. Coudere*, jun. a merchant in *Bourdeaux*, from whose deposition it appeared, that he acted as the consignee of the ship at that place : that he paid for the repairs in cash, and with his own funds, and took a *bottomry bond* on the ship from the captain, at his own risk, at 25 per cent marine interest; that he received the freight at *Bourdeaux*, but received it on account of a Mr. *Rousillot*, who had drawn on him for more than the amount ; and the value of the cargo belonging to the plaintiffs, was absorbed by their drafts on *London*, which the consignee had engaged to pay for their account.

The master of the vessel testified, that he had no funds to defray the expense of repairs, nor did he know of any person at *Bourdeaux*, who had funds or effects of the plaintiffs ; that the repairs were all paid for by

ALBANY,
August, 1808.

Reade
v.
Commercial
Ins. Company.

*Coudere.* The master applied to no other person, and was directed to *Coudere* by the plaintiffs. When the repairs had commenced, *Coudere* informed the master, that he had no funds, and that the master must secure him by bills drawn on the plaintiffs, or by a bottomry bond, to which the master agreed. When the repairs were completed, *Coudere* demanded a bottomry bond as his security, which the master accordingly gave. The ship was repaired on the credit, and at the sole expense of *Coudere*, and the master incurred no personal responsibility whatever, except what arose from his execution of the bottomry bond.

On the return of the ship to *New-York*, the defendants were requested to take up the bottomry bond, and on their refusal, the ship was libelled in the district court of the *United States*, and the amount recovered, which was paid by the plaintiffs, to prevent a sale of the ship.

A verdict was taken for the plaintiffs, subject to the opinion of the court on the following questions :

1. Whether there was a deviation ?

2. Whether the defendants were liable for the *marine interest* on the bottomry bond given for the expenses of repairs at *Bourdeaux ?*

It was agreed, that the amount of the sum to be paid, under the opinion of the court, should be adjusted by three persons, who were named in the case.

*Hopkins*, for the plaintiffs. 1. All the witnesses agree, that going through the *Sound*, instead of the *Narrows*, was, under the circumstances of the case, prudent and justifiable. *Emerigon** mentions the case of the *Benjamin*, insured from *St. Domingo* to *France*. This vessel, with several others, in order to avoid the *English* cruisers, went through the *Streights of Bahama*, instead of taking the usual route, and was afterwards captured. On an appeal, the court of *Cassation*, at *Paris*, held, that the insurers were bound to pay for a total loss. The same author is of opinion, that going out of the usual route, in order to avoid the payment of an oppressive or illegal

* 2 *Emeri.* 58, 59, 60.

toll, is justifiable, and does not amount to a deviation.(*a*) And *Marshall* says, that to avoid an enemy, is a cause of excusable deviation.*

2. The vessel arrived at *Bourdeaux*, in so shattered a condition, that repairs were necessary. The plaintiffs were not bound to have funds sufficient to defray the expense of repairs. If they had no funds there, the master was justifiable in taking up money for that purpose, on bottomry ; and the bottomry bond becomes the measure of damages for which the insurers are liable. I rely on the case of *Dacosta* v. *Newnham*,† as containing the established doctrine on this subject, and as applicable to the present case.

*Wells*, contra. 1. It is agreed that the passage through the *Narrows*, and by the way of *Sandy-Hook*, is the most usual and customary route for vessels proceeding from the port of *New-York*. Going through the *Sound*, therefore, amounts to a deviation, unless excused by imperious circumstances. It is well known, that the danger of navigation through the *Sound* is much greater than through the *Narrows*. Admitting that there was a danger of detention or capture by *British* cruisers off the *Hook*, there was also, on the other hand, the greater danger of the navigation through the *Sound*. There was, then, a case for deliberation and the exercise of judgment, as to a choice of the route. In ordinary cases, where two routes occur, the master must decide, according to his best skill and discretion, which of them to take. The insurers are entitled to the benefit of a free exercise of the master's judgment, whose opinion ought not to be controuled by the owners of the vessel. If the insured undertake to

*ALBANY, August, 1808.*

Reade v. Commercial Ins. Company.

* *Marsh.* 412.

† 2 *Term Rep.* 407.

(*a*) *Roccus* is also of opinion, that the insured may deviate, from a necessary and just cause ; as, for example, to avoid a storm, or an enemy. " *Si iter mutaverit ex aliqua justa, et necessaria causa, puta, ex causa refectionis, vel ad evitandam maris tempestatem, vel ne incideret in hostes ; siquidem in istis casibus, mutato itinere, tenetur assecurator.*" *De Assec. N.* 52. 93. See also *Pothier, Trait. des Ass.* n. 51.

ALBANY,
August, 1808.

Reade
v.
Commercial
Ins. Company.

* *Marsh.* 407.
*Middlewood* v.
*Blakes,* 7 *Term
Rep.* 162.

† *Abbott,* 112.

‡ *Peters' Ad-
miralty Deci-
sions,* p. 302,
303.

prescribe to the master which course he is to take, the insurers are discharged, in case of a loss happening on the route prescribed.* Here the plaintiffs, without consulting the defendants, instructed the master to go through the *Sound.* As the insurers were on the spot, their consent ought to have been obtained.

2. I contend that the master, in this case, had no authority to *bottomry* the vessel ; and if so, the defendants are liable for no more than the amount of necessary repairs. The power of the master to borrow money on *bottomry,* arises out of the necessity of the case, and is limited by fixed bounds.† It is essential to the exercise of this power, that no other means of supplying the wants of the ship exist ; and that it is necessary to the safety of the ship, and the prosecution of the voyage. This power cannot be exercised in the place where the owners reside, nor where the owners have funds provided, or have agents or consignees who are bound to furnish the requisite funds on the credit of the owners.‡ In the present case, the vessel was not forced by necessity into an intermediate port, but arrived at her place of destination, where the plaintiffs had a regular consignee or agent. The master had goods on board belonging to the plaintiffs, and for which he was entitled to receive freight. The freight money was the proper fund out of which to defray the expense of repairs. The master does not state, that he made any attempt to procure money in any other way. *Coudere* required bills on the plaintiffs, or a bottomry. The master, having his option, ought to have drawn bills on the owners, rather than to subject them to the payment of a high marine interest. Again, the money must be advanced on the faith of the ship, but the consignee advanced the money before the master had decided to give a bottomry. *Coudere* appears as a regular consignee of the vessel and of the goods of the plaintiffs, who possessed a credit with him. He ought not, then, to have exacted the same security as a stranger. It would be dangerous to allow a consignee to take bottomry bonds, in such a

case, as a collusion between him and the master, for the purpose of exacting from the owner a heavy *premium* for advances, would be so easy. The necessity of the case ought to be strong and manifest; it ought to appear that the last and only resource of the master for the safety of the ship, and the completion of the voyage, was to resort to this species of loan.

3. Admitting, however, that the master had a right to bottomry the vessel at her port of destination, yet it does not follow, that the insurer is liable for the *marine interest*. Lending money on bottomry, resembles the contract of insurance; in each a *premium* is received, calculated upon the nature and length of the voyage, the risk of which is run by the insurer in the one case, and the lender in the other. As the insurer derives no benefit from the loan, he ought not to be obliged to pay the *premium*. Ordinary interest is never, in fact, charged on the amount of disbursements for repairs, for which the insurer is liable; *a fortiori* he ought not to be held to pay *marine interest*. The insurers on this policy undertake to pay in 30 days after proof of the loss; and until the accounts of the repairs are produced, there can be no proof of loss; and the contract of indemnity does not extend further than the repairs.

The case of *Dacosta* v. *Newnham* is different from the one before the court. There the insured, on advice of the accident, offered to abandon, and the insurer insisted upon the vessel's being repaired. The insured acted under the orders of the insurer, and a bottomry bond having been given for the repairs, which they refused to pay, they were held liable for all the consequences of their refusal. The plaintiff had an undoubted right to abandon for a total loss, and the question whether the defendant was bound to pay *marine interest*, did not arise. The case was decided on a different principle.

*Hopkins*, in reply. The insured, on his contract of indemnity, is bound for all the loss and injury arising from any of the perils mentioned in the policy, and for every

necessary repair during the voyage. If the master acted *bona fide* in giving the bottomry bond, and there was no other mode of raising the money to make the necessary repairs, the defendants ought to pay the amount of the bond ; it is a direct consequence of the necessity of repairs occasioned by the perils of the sea. It is usual to advance the money first, and take the security afterwards. The consignee had a right to insist on the security upon the vessel, without trusting to the personal responsibility of the owners. If a total loss has been prevented by making the repairs, the defendants have been benefited, and ought to pay the principal and interest of the bond.

VAN NESS, J. delivered the opinion of the court. There are two questions in this cause.

1. Was the going to sea through the *Sound*, under the circumstances of this case, a deviation ? And,

2. Are the defendants liable for the marine interest on the money borrowed on bottomry at *Bourdeaux* ?

There are two passages to sea from the port of *New-York ;* one by the *Sound*, and the other by the *Narrows*. The former has of late years been frequently pursued, but the latter is used in far the greater number of cases, and is the most usual and ordinary course for vessels, sailing from the port of *New-York* on a foreign voyage.

In every contract of marine insurance, there is an implied condition on the part of the insured, that the ship shall proceed on her voyage to her destined port, in the shortest, safest, and most usual course. If this be not done, and the ship, without just and reasonable cause, leaves the regular and customary track, it is a deviation, and from that time the policy is at an end, and the insurer is discharged from all subsequent responsibility.

If there were no evidence in this case to justify the departure of the ship from the most usual and ordinary course, we are inclined to think that here would have been a deviation ; but under all circumstances, we consider that there

was a just and reasonable ground for such departure, though there may not have been an *absolute* necessity for it.

The ship was bound to a *French* port, having a number of *French* passengers on board, some of whom were sent home on account of the *French* government, and part of her cargo was colonial produce. At the time she sailed, the *Cleopatra*, and other *British* ships, were off *Sandy-Hook*, who captured several *American* ships, and there was considerable apprehension on this subject among the merchants. Under these circumstances, the owners were justifiable in instructing the captain to go by the way of the *Sound*, and there was no occasion to apply to the underwriters for their consent to a measure so obviously the dictate of prudence, and for the benefit of all concerned. It is no deviation to go out of the ordinary track to avoid danger. (*Marshall*, 408.) That in this case, there was danger, not only of detention, but even of capture and condemnation, cannot reasonably be doubted. To avoid this danger, it was a prudent exercise of the discretion resting with the owners, to direct the master to leave the customary passage to the sea, and to pursue another, not new and unexplored, but occasionally used, and in which there were regular pilots. The owners, in giving these instructions, could have no sinister views, and it is not pretended but that they acted with the most perfect good faith, for the benefit of all parties interested, and with the sole view to conduct the ship and cargo by the safest course to her port of destination.

It has been said, that in cases where a departure from the usual course is excusable, for reasons growing out of the circumstances existing at the time, the insured have a right to the opinion of the master, and to the uncontrouled exercise of his discretion. This is true to a certain extent: As, where the voyage has been commenced, and when the circumstances which render such a departure expedient, are unknown to the owners, and when, conse-

quently, they could not form so correct an opinion as the master. Such was the case of *Middlewood* v. *Blakes*, (7 *Term Rep.* 162.) But when the departure takes place, as in the present case, where the owner is on the spot, and well acquainted with all the circumstances, and, in all probability, most competent to judge of their urgency and weight, there can be no use, neither is there any reason or necessity for consulting the master, or leaving the course to be pursued to his discretion.

Whether the defendants are liable for the marine interest or not, for the money borrowed by the master at *Bourdeaux*, is the next question; and in the consideration of which, it is taken for granted, that the repairs of the vessel were rendered necessary by the injuries she had sustained in the course of her voyage, by the perils within the policy, and for which, consequently, the insured are liable.

The general power of the master to hypothecate the ship abroad, for the purpose of raising money necessary for completing the voyage, is not questioned, but it is objected in this case, that such right does not exist at the port of destination; that there was no necessity for resorting to this mode of raising money; and that, at all events, admitting the right of the master in this case, still it was not so exercised as to subject the insurers to the payment of the marine interest.

The only limitation of the master's right to hypothecate the ship, in case of necessity, is, that it shall be exercised *abroad*, and not in the place where the owners reside. The reasons from which the origin of this right is deduced, seem to apply with as much force to the case where the necessity for exercising it arises at the port of destination, as at any other port into which the vessel may have been driven in distress. The only difference between the two cases is, that in the one, the necessity which justifies the exercise of the right, is more palpable and manifest than in the other. Freight is frequently made

payable, and the insured commonly have a correspondent and credit at the port of destination, and while the captain can find resources from either of these, he would not have a right to pledge the ship. But it does not follow, from thence, that if the master does not receive freight, and cannot borrow money upon the credit of the insured, that he may not pledge the ship. The only and important inquiry must necessarily be, were the exigencies of the case such as to render a pledge of the ship indispensable, and that being granted, the right results of course, wheresoever the vessel may then be. Suppose, in the case of an insurance out and home, and the injury to the vessel happens at the port of delivery, or at sea, when the port of delivery is the nearest port into which the vessel can put, and that the freight is not payable until the ship's return, and the master is unable to procure money for the necessary repairs, to enable him to complete the voyage in any other way than upon bottomry, what is he to do? One of two things; he must either pledge the ship, or give up the voyage. By doing the one he may, at a trifling loss to the underwriter, repair the ship and perform the voyage; by doing the other, the underwriter may be subjected to a total loss.

*Abbott*, *Marshall*, and *Park*, recognise the master's right to borrow money on bottomry in a *foreign country*, whenever it is essential to the safety of the ship and the success of the voyage: and the term " foreign country" is used in contradiction to the place of the owner's residence. (*Marsh. on Insur.* 638. *Park on Insur.* 413, 414. *Abbott on Shipping*, 118.) So also are the laws of the *Hanse Towns*, (art. 3.) and of *Wisbuy*, (art. 45.) See also the *Marine Ordinance of France*, (art. 17. and 19. book 2. tit. 1.) Upon principle, therefore, as well as authority, we are satisfied, that in cases of necessity, and when the master cannot otherwise procure the money, he may borrow it on bottomry, and hypothecate the vessel for the repayment of it, as well at the port of destination, as at any other foreign port.

ALBANY,
August, 1808.

Reade
v.
Commercial
Ins. Company.

ALBANY,
August, 1808.

Reade
v.
Commercial
Ins. Company.

But there are circumstances in the present case, which ought to induce the court to lean against rendering the insurers liable for the marine interest.

The bottomry bond was given to the consignee of the ship, and of the plaintiffs' part of the cargo. The consignee was the person to whom the master alone applied, and upon whom he relied, as he says, for every thing; and there is every reason to believe, that the necessity of repairs and of money for that purpose, was made known to the consignee upon the arrival of the ship. Notwithstanding this, he diverted the funds in his hands to other objects, and advanced his own money at an interest of 25 per cent.

To render the insurer liable for *marine interest*, it ought evidently and clearly to appear, that there were no other means of raising money, than by a bottomry bond.

The conduct of the consignee is not free from all suspicion. If the master had pressed him to make the advances for bills upon the plaintiff, he might have agreed to accept them. It does not appear, neither can it be fairly inferred from the evidence, that the master ever attempted to obtain the money on the credit of the owners; but on the contrary, it appears that he at once agreed, either to give the bills or the bottomry bond; and it is even doubtful whether the master had not himself the election to give the one or the other. The consignee did not advance the money exclusively on the engagement to give a bottomry. It was the duty of the master to have exhausted all other means of raising the money, before he could legally subject the insurer to the payment of an extravagant marine interest. He did not do so, and it is questionable, whether this bond was valid, even as against the owners; but we are clearly of opinion, that the insurers cannot be affected by it.

The opinion of the court, therefore, is, that the marine interest must be deducted from the amount of the ver-

·dict, and that the plaintiffs must have judgment for the residue only.

THOMPSON, J. not having heard the argument in the cause, gave no opinion.

Judgment for the plaintiffs.